1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| SEAN J. MACE, | Case No.15-cv-04060-LB |
| Plaintiff, | |
| v. | **SUMMARY-JUDGMENT ORDER** |
| THE UNITED STATES OF AMERICA, et al., | Re: ECF No. 57 58 |
| Defendants. | |

### INTRODUCTION

This is a personal-injury suit against the United States and a private contractor for injuries that the plaintiff suffered while visiting the San Francisco Maritime National Historical Park.[1] The defendants have both moved, separately, for summary judgment.[2] The parties have consented to magistrate jurisdiction.[3] The court held a hearing on these motions on February 23, 2017.[4] The

---

[1] *See generally* 1st Am. Compl. –ECF No. 33. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] ECF Nos. 57 (Bartlett), 58 (United States).

[3] ECF Nos. 7, 13, 38.

[4] ECF No. 69.

ORDER — No. 15-cv-04060-LB

*United States District Court*
*Northern District of California*

1    court now denies the United States' motion and partly grants the motion of the F.A. Bartlett Tree

2    Expert Company.

3

4                                          **STATEMENT**

5    **1.   The Accident**

6           On October 12, 2014, plaintiff Sean Mace sat on the ground in the San Francisco Maritime

7    National Historical Park, reading, drinking coffee, and socializing beneath a stand of five

8    *Araucaria bidwilii,* or "false monkey-puzzle" trees.[5] The NPS had neither charged Mr. Mace to

9    use the park nor personally invited him into the park.[6] A cone or "seed pod" fell from the high,

10   dense tree canopy and struck Mr. Mace on the head.[7] Seed pods of the *Araucaria* can be as large

11   as 10 inches by 6 inches and weigh as much as 15 pounds.[8] The pod that struck Mr. Mace caused

12   serious injury. As a result of the accident, Mr. Mace suffered a "traumatic brain injury" with

13   "neurologic failure" and underwent a partial craniotomy.[9]

14

15   **2.   The *Araucaria* Trees**

16          The parties do not disagree over the trees' relevant characteristics. Native to Australia, these

17   trees are considered exotic in Northern California.[10] They are almost entirely "covered with

18   spikes, [and] thorns," making them "extremely difficult to climb" and work in.[11] The cones rest in

19

20

21

22

23   [5] Mace Dep. – ECF No. 58-2 at 12–15; ECF No. 58-2 at 7–9 (interrogatory answers). Deposition
     citations use the ECF-generated page numbers rather than the transcripts' original pagination.

24   [6] Mace Dep. – ECF No. 58-2 at 13–15.

25   [7] ECF No. 58-2 at 8–9; *see* 1st Am. Compl. –ECF No. 33 at 4–5 (¶¶ 18, 25).

26   [8] Leggitt Rep. – ECF No. 62-4 at 30.

     [9] Hospital Records – ECF No. 62-4 at 125–32.

27   [10] *See* Leggitt Rep. – ECF No. 62-4 at 30.

28   [11] Hegedus Dep. – ECF No. 57-2 at 97 (quoted language); Lee Dep. – ECF No. 57-2 at 24.

United States District Court
Northern District of California

a dense, similarly colored canopy that makes them hard to see.[12] The cone that hit Mr. Mace was approximately 10 inches by 6 inches, about the size of a football.[13]

### 3.   The Defendants' Efforts to Prune the Trees

The park is a federal facility that is owned by the United States and operated by the National Park Service (NPS).[14] It is open to the public, free of charge, and is near other popular San Francisco tourism destinations. The NPS knew that the park's *Araucaria* trees presented a hazard. More exactly, the NPS knew that the trees' seed pods could weigh from 10 to 15 pounds and would occasionally fall to the ground.[15] There is some dispute over the extent of this risk — including, specifically, over the frequency with which seed pods would fall to the ground. The NPS claims that, according to its staff's observations, cones fell to the ground at a rate of less than one cone per tree per year.[16]

In 2007 the NPS hired Costello's Tree Services to assess all the trees in the park. Costello's (which is not a party to this suit) reported that the *Araucaria* trees were in a condition that rated 3 on a scale of 1 to 5, and recommended that they be "safety pruned."[17] Following the Costello report, NPS staff reached a "best guess" that they should hire someone to address the trees — to remove dead branches, for example, and visible cones — every "[t]wo to three years."[18] This estimate was based on the staff's "observations of . . . how frequently [they] observed [seed-pod]

---

[12] *See* Carrasco Dep. – ECF No. 57-2 at 72 and ECF No. 68-1 at 14–15; Wright Dep. – ECF No. 68 at 8–9; Kier Dep. – ECF No. 62-1 at 11.

[13] Wu Dep. – ECF No. 57-2 at 107–09. The parties have also discussed the cones' maturity cycle, but this has not proved important to the court's summary-judgment analysis.

[14] The NPS is an agency within the United States Department of the Interior.

[15] Wright Dep. – ECF No. 68 at 4–10; Kier Dep. – ECF No. 62-1 at 20, 27, 31.

[16] The United States seems to calculate this rate from several facts. The park, again, had five *Araucaria* trees. NPS employee Micah Wright joined the park in January 2012 and testified that, between that date and October 2014, he had observed seed pods on the ground seven or eight times. Wright Dep. – ECF No. 58-2 at 106, 109–11. The number is therefore fair if we consider only Mr. Wright's observations. The court mainly cites this fact to flesh out the narrative. This particular assertion has not played a critical role in the court's analysis, as the discussion below should show.

[17] Costello Report – ECF No. 58-2 at 182.

[18] Lee Dep. – ECF No. 57-2 at 30–32.

remnants on the ground and perhaps [by] extrapolating from [what they knew about] other pine trees . . . ."[19]

The park's NPS unit did not have the resources to assess and prune the trees itself.[20] It thus obtained a proposal from Bartlett to "[p]rune" the *Araucaria* trees and, most saliently, to "[i]nspect and remove visible large cones from the trees."[21] This was in December 2009; the following month, using an aerial lift to access the tree canopy, Bartlett removed the "visible large" seed pods from the trees.[22] In late 2012, NPS staff noticed seed pods on the ground and again contacted Bartlett to submit a bid for pruning the trees.[23] Bartlett again submitted a proposal specifying that it would "[i]nspect and remove visible large cones from the trees."[24] Bartlett did this work on February 26, 2013.[25] This was approximately 19 months before Mr. Mace's accident.

In neither contract did Bartlett agree to develop an extended plan for the NPS to maintain the *Araucaria* trees.[26] Nor did Bartlett agree, in either proposal, to advise the NPS on how to make the *Araucaria* stand safer for park visitors.[27] Both proposals stated that Bartlett's work would be "done in accordance with ANSI A300 Tree Care Standards."[28]

The parties seem to agree that pruning these trees presented a challenge even for Bartlett. They also both recognize that the dense *Araucaria* canopy hides many cones from view.[29] Consequently, the parties seem to recognize that the specific contractual task that Bartlett took on — removing

---

[19] *Id.*

[20] *See* Carrasco Dep. – ECF No. 58-2 at 64–68, 82–83; Lee Dep. – ECF No. 58-2 at 122–23, 129, 142–43; Kier Dep. – ECF No. 58-2 at 94; Wright Dep. – ECF No. 58-2 at 104–05, 112.

[21] ECF No. 58-2 at 185–86.

[22] *See* Lee Dep. – ECF No. 57-2 at 38–39; Carrasco Dep. – ECF No. 58-2 at 71–72,

[23] Wright Dep. –ECF No. 57-2 at 100–01.

[24] ECF No. 57-2 at 78–79.

[25] Carrasco Dep. – ECF No. 58-2 at 78–80.

[26] *See* ECF No. 58-2 at 185–86; ECF No. 57-2 at 78–79.

[27] *See* ECF No. 58-2 at 185–88; ECF No. 57-2 at 78–81.

[28] ECF No. 58-2 at 188; ECF No. 57-2 at 81. "ANSI" is the ubiquitous American National Standards Institute. Bartlett contracted for and performed other work on the *Araucaria* trees, such as removing branches (*see* ECF No. 57-2 at 79), but that additional work is not relevant to this discussion.

[29] *Supra*, note 12.

United States District Court
Northern District of California

the "visible large cones" — was appropriate to the situation.[30] For, as Bartlett points out, if you can't see a cone, you can't remove it. There is no dispute, then, that it would have been unrealistic to expect that every cone could be seen and removed.[31] Neither the United States' expert witness, nor Mr. Mace's, could say that the particular cone that struck Mr. Mace was on the tree in February 2013.[32]

There is no record proof of an *Araucaria* cone striking any other park user before one struck Mr. Mace.

### 4. The Claims

Mr. Mace sues the United States for negligence through the Federal Tort Claims Act (FTCA).[33] He sues Bartlett for negligence.[34]

## ANALYSIS

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to

---

[30] *See* Carrasco Dep. – ECF No. 57-2 at 72.

[31] *Id.*

[32] *See* Leggitt Dep. – ECF No. 65-1 at 5–7 (pp. 112, 157–58); Clark Dep. – ECF No. 65-1 at 10–12 (pp. 97, 103–04). Bartlett has not proffered expert testimony.

[33] *See* 1st Am. Compl. – ECF No. 33 at 4, 9–10 (¶¶ 14, 40–51). More exactly, Mr. Mace brings two claims against the United States: one for straight negligence, and one in premises liability for negligent conduct.

[34] *Id.* at 10–11 (¶¶ 52–57).

United States District Court
Northern District of California

1    interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

2    fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party

3    must either produce evidence negating an essential element of the nonmoving party's claim or

4    defense or show that the nonmoving party does not have enough evidence of an essential element

5    to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,

6    210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)

7    ("When the nonmoving party has the burden of proof at trial, the moving party need only point out

8    'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*,

9    477 U.S. at 325).

10       If the moving party meets its initial burden, the burden shifts to the non-moving party to

11   produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The

12   non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

13   but instead must produce admissible evidence that shows there is a genuine issue of material fact

14   for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to

15   show a genuine issue of material fact, the moving party is entitled to summary judgment. *See*

16   *Celotex*, 477 U.S. at 323.

17       In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

18   viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith*

19   *Radio Corp.*, 475 U.S. 574, 587 (1986).

20

21   **1.   The Government's Motion**

22      **1.1 Governing Law — California's Recreational-Use Statute (Cal. Civ. Code § 846)**

23       The United States argues that it is immune from Mr. Mace's negligence claim as a matter of

24   law under California's recreational-use statute (Cal. Civ. Code § 846). This statute "protects

25   landowners and other interest-holders . . . from liability for negligence to those who enter or use

26   their land for recreational purposes." *Mattice ex rel. Mattice v. U.S., Dep't of Interior*, 969 F.2d

27   818, 820–21 (9th Cir. 1992). Section 846 applies to the NPS because the FTCA waives sovereign

28   immunity "only to the extent that a private person would be liable" under governing law — in this

United States District Court
Northern District of California

case, California's. *Id.* at 820. The recreational-use law provides that a landowner "owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises" to visitors. *See id.* (quoting Cal. Civ. Code § 846). A "recreational purpose," as § 846 defines that term, "includes activities such as . . . sightseeing, picnicking, . . . and viewing or enjoying historical, archaeological, scenic, natural, or scientific sites." Cal. Civ. Code § 846. The key part of § 846 is the immunity that it extends to landowners:

> An owner of any estate . . . in real property . . . who gives permission to another for entry or use for the above purpose upon the premises does not thereby (a) extend any assurance that the premises are safe for that purpose, or . . . (c) assume responsibility for or incur liability for any injury to person or property caused by any act of the person to whom permission has been granted except as provided in this section.

*Id.* Furthermore, "[n]othing in this section [846] creates a duty of care or ground of liability for injury to person or property." *Id.* The only relevant exception to § 846 immunity is the following: "This section [846] does not limit the liability which otherwise exists . . . for *willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity* . . . ." *Id.* (emphasis added).

### 1.2  Analysis

There is no dispute that, on the day of his accident, Mr. Mace was in the park "recreating" within the meaning of this statute. There is also no dispute that he was otherwise in the class of recreational users to whom a landowner generally owes no duties under § 846: The NPS did not personally invite Mr. Mace into the park, and it did not charge him to use the park. *See* Cal. Civ. Code § 846. To this point, then, § 846 immunity should bar Mr. Mace's claim against the NPS. The pivotal question is whether Mr. Mace's claim falls within § 846's relevant exception. That is to say, has Mr. Mace raised a genuine issue for trial that the NPS willfully or maliciously failed to guard or warn against the danger that the *Araucaria* trees presented?

The court thinks that he has.

1    "To establish willful misconduct under California law, a plaintiff must show that the

2    defendant: (1) had actual or constructive knowledge of the peril; (2) had actual or constructive

3    knowledge that injury was probable, as opposed to possible; and (3) consciously failed to act to

4    avoid the danger." *Mattice*, 969 F.2d at 822. Willfulness under § 846 does not require subjective ill

5    intent. *See New v. Consol. Rock Prods. Co.*, 171 Cal. App. 3d 681 691–92 (1985).

6

7        ### 1.2.1   Known risk

8        The first element of this test is met. The NPS knew that the falling *Araucaria* cones presented

9    a hazard. The chance that a falling cone might strike a park user was exactly why the NPS brought

10   in Bartlett to prune the trees and remove the "visible large cones."

11

12       ### 1.2.2   Probable risk

13       The court is further satisfied that the NPS knew that an injury from the *Araucaria* was

14   "probable, as opposed to possible." More exactly, the court holds that Mr. Mace has raised a

15   triable issue on this point. Conversely put, the court cannot say as a matter of law that the NPS did

16   not know, at least constructively, that the *Araucaria* seed pods would "probabl[y]" injure someone.

17       The probability calculus under § 846 encompasses both the frequency of the risk and the

18   gravity of the potential harm. The § 846 "probability" inquiry, in other words, is not a pure

19   frequency test. Thus, in one § 846 case, the Ninth Circuit could find the frequency with which the

20   accident site was used "much less important" than the seriousness of the danger that the site

21   presented. *See Termini v. United States,* 963 F.2d 1264, 1269 (9th Cir. 1992) ("That only two

22   vehicles a day typically use the [Forest Service road] spur seems to us much less important than

23   the fact that it abruptly terminates at a cliff.").

24       "That there were no prior accidents" in which an *Araucaria* cone struck a park visitor is not

25   decisive. *See Lashley v. United States*, 2006 WL 2788243, *8 (N.D. Cal. 2006). "California courts

26   have frequently rejected such reasoning, noting that the matter of probability is not to be assessed

27   solely by the number of prior accidents, which adventitiously may have been few, but by all the

28   circumstances." *Id.* (quoting *Termini,* 963 F.2d at 1269). "Such circumstances include 'whether

United States District Court
Northern District of California

1    there were prior accidents'. . . [,] defendant's knowledge that persons were engaged in recreational

2    activity at the location . . [,] and the location of the property itself." *Esteban v. United States*, 2015

3    WL 5093786, *6 (N.D. Cal. Aug. 27, 2016) (quoting *Manuel v. Pac. Gas & Elec. Co.,* 173 Cal.

4    App. 4th 927, 946 (2009)).

5        It is undisputed that the park is located near other popular San Francisco destinations. The NPS

6    knew that park visitors could access the area beneath the *Araucaria* trees. (Although it seems

7    equally clear that the area beneath the *Araucaria* stand is not groomed for sitting; this is in contrast

8    with the lawn and benches in the area immediately abutting these trees.[35]) Furthermore, it is

9    relevant to the § 846 probability assessment that the *Araucaria* cones presented a hidden danger.

10   *See Mattice,* 969 F.2d at 822 ("The cases in which we have upheld a claim of willful misconduct

11   under California law have all involved a hidden peril.") (quoted in *Esteban*, 2015 WL 5093786 at

12   *5). The cones sat in a high, dense tree canopy that hid at least some of them from view — and

13   were in an exotic tree species whose unusual hazard park users in San Francisco might not have

14   appreciated. Even if the cones fall as uncommonly as the NPS says they do, and so might strike

15   someone even more rarely, there is no real dispute that the cones' size and weight meant that the

16   consequences of their hitting a park user could be grave. There is indeed sufficient evidence that

17   the NPS appreciated that these pods could inflict serious harm.

18       The court holds that, in these circumstances, Mr. Mace has raised an issue for trial on whether

19   the NPS knew that injury was probable. As Judge Alsup of this court wrote in *Lashley*:

20           Here, where the [NPS] knew of the potential for injury in a heavily-visited historic
             [site], the likelihood of injury might have been 'probable,' rather than merely
21           'possible.' Determining whether that likelihood was probable or only possible is a
             question of fact inappropriate for resolution at summary judgment.
22

23   *Lashley*, 2006 WL 2788243 at *8.

24

25

26

27

─────────────────────

28   [35] *See* Clark Decl. – ECF No. 58-3 at 3 (¶ 8), 6, 8 (pictures of stand and nearby lawn).

### 1.2.3   Failure to act — Reckless disregard

The ultimate question under § 846 — and for the defendant's motion — is thus whether the NPS "consciously failed to act to avoid the [known] danger." *See Mattice*, 969 F.2d at 822. Couched in terms more specific to this case, the operative issue is whether the NPS can be said to have acted willfully by not doing more than it did. The NPS obviously took some steps "to avoid the danger." It hired Bartlett. Did the NPS nonetheless "consciously fail[] to act" within the meaning of § 846? Has the plaintiff raised a genuine issue on this point?

Here, too, the court holds that Mr. Mace has raised an issue for trial.

Several points should now be called to mind. First, willfulness under § 846 does not require subjective ill intent. *See New*, 171 Cal. App. 3d at 691–92. Second, though it "differ[s] in quality rather than degree from ordinary lack of care," willfulness in California law may be viewed as an "aggravated form of negligence." *Id.* at 689 (quoting W. Prosser, *Law of Torts* § 34, p. 184 (4th ed. 1971)). Third, willful misconduct may be "done either with a knowledge that serious injury to another will probably result, or with wanton and *reckless disregard* of the possible results." *Id.* (quoting *O'Shea v. Claude C. Wood Co.,* 97 Cal. App. 3d 903, 912 (1979)) (emphasis added); *accord Rost v. United States*, 803 F.2d 448, 450 (9th Cir. 1986). Fourth, "a person acts with conscious disregard for the safety of others when he is aware of the probable dangerous consequences of his conduct and wilfully and deliberately fails to avoid those consequences." *New*, 171 Cal. App. 3d at 691. Finally, a defendant may act to diminish a known hazard and yet make efforts "so feeble" that a trial question remains on willful misconduct. *See Lashley*, 2006 WL 2788243 at *8; *Simpson v. United States,* 652 F.2d 831, 834 (9th Cir. 1981).[36]

In this doctrinal context, the court thinks that Mr. Mace has raised a genuine issue on willful misconduct. First, Mr. Mace was entirely passive with respect to the risk. He was sitting beneath the trees, reading and socializing. Contrast this with injured § 846 plaintiffs who had actively engaged in some more or less hazardous activity. *E.g., Manuel*, 173 Cal. App. 4th at 930–31, 939–

---

[36] *Simpson* was disapproved on other grounds by *Ravell v. United States*, 22 F.3d 960, 963 (9th Cir. 1994).

United States District Court
Northern District of California

48 (climbing electrical tower); *Novikoff v. United States*, 2013 WL 5883786, *1, *4–6 (E.D. Cal. Oct. 30, 2013) (bicycle race along canal path). The danger in this case moreover was hidden. It is undisputed that the *Araucaria* cones hang in a high, dense tree canopy, that the NPS had posted no signs warning that heavy cones might fall from above, and that Mr. Mace in fact was unaware of this danger. This recalls "cases [under § 846] in which a conscious failure to act was found where the danger was hidden from the plaintiff." *See Lashley*, 2006 WL 2788243 at *8 (discussing *Miller v. United States*, 945 F.2d 1464 (9th Cir. 1991) (reversing summary judgment for defendant), and *Rost*, 803 F.2d at 1450–51 (affirming judgment against defendant)). The exotic nature of the trees plays a role here, too. Visitors in San Francisco would not likely be familiar with these trees and their unusual danger — while the NPS, for its part, knew that the trees posed a threat. This too may be viewed as a way in which the peril was hidden from park users. *Cf. Termini*, 963 F.2d at 1268 (reversing bench verdict for defendant under § 846) ("The unusual nature of this [road] spur . . . warranted special precautionary measures by the United States."). Finally on this head, the record suggests that further, fairly simple options were available. The NPS could have planted a "soft" landscape barrier at the foot of the *Araucaria* stand to dissuade park visitors from sitting beneath the trees.[37] It could have posted warnings. One NPS park employee testified that, sometime before Mr. Mace's accident, he considered posting a sign to warn visitors that the trees dropped potentially harmful seed pods; but the agency never did post warnings.[38] *See Lashley*, 2006 WL 2788243 at *8 (denying defendant's § 846 summary-judgment motion) (defendant had not followed own employee's recommendation to install handrail on staircase from which plaintiff fell).

* * *

On this record, the court holds that "[w]hether the [NPS's] efforts . . . were so feeble as to rise to the level of willfulness is a material issue of fact" that "prevent[s] summary judgment." *Lashley*, 2006 WL 2788243 at *8 (quoting *Simpson*, 652 F.2d at 834). Though the NPS acted to

---

[37] *See* Leggitt Rep. – ECF No. 62-4 at 49; Leggitt Decl. – ECF No. 59 at 6–8 (¶¶ 15[D], 16[B]).
[38] Wright Dep. – ECF No. 68 at 28–29.

address the risk — having Bartlett prune the trees — failing to do more may yet have constituted reckless disregard. *See Termini*, 963 F.2d at 1269 ("It would have been very easy for the United States to take precautions to guard against the sort of injury that occurred here. The USFS could simply have erected a sign . . . warning drivers of the cliff . . . ."). The plaintiff has raised a triable issue on whether the NPS "consciously failed to act to avoid the danger" that the *Araucaria* cones posed.

### 2. Bartlett's Motion

Against Bartlett Mr. Mace brings one claim for negligence. He complains that Bartlett owed but breached "duties to the general public" by: (1) "failing to remove all seed pods"; (2) "failing to recommend [to the NPS] a tree[-]maintenance program . . . to eliminate the risk of harm posed by large falling seed pods"; and (3) "fail[ing] to recommend the installation of signage or other warnings."[39] In opposing summary judgment, Mr. Mace added a further alleged breach. He argues that not removing all the cones prompted the trees to a faster maturity cycle.[40] (The fuller idea being that removing only the "visible large cones" "influenced the production of larger cones at a quicker maturation rate . . . and . . . increas[ed] the growth of the remaining cones."[41]) He contends that Bartlett should have at least warned the NPS that this "residual risk" would be a result of not removing all the cones.[42]

Bartlett responds that it owed no duty that went beyond its express contractual commitments. No duty, that is, to do anything other than (so far as is relevant here) removing the "visible large cones." More exactly, Bartlett denies that it owed the public a duty to develop a maintenance program for the *Araucaria* trees or give the NPS recommendations or advice about making the area near the trees safer for park visitors.

---

[39] 1st Am. Compl. – ECF No. 33 at 7–8, 11 (¶¶ 35, 54).

[40] *See* Leggitt Rep. – ECF No. 62-4 at 60–64.

[41] *Id.* at 60.

[42] *See* Opp. to Bartlett MSJ – ECF No. 60 at 7, 16; Pl. Jt. Stmt. of Facts – ECF No. 61 at 8 (¶ 32); Leggitt Decl. – ECF No. 59 at 7 (¶ 16[B]).

United States District Court
Northern District of California

1

**2.1 Governing Law — Negligence & *Seo***

"Actionable negligence is traditionally regarded as involving the following: (a) a *legal duty* to use due care; (b) a *breach* of such legal duty; (c) the breach as the *proximate or legal cause* of the resulting injury." *Seo v. All-Makes Overhead Doors*, 97 Cal. App. 4th 1193, 1202 (2002) (quoting *Jackson v. Ryder Truck Rental, Inc.*, 16 Cal. App. 4th 1830, 1837 (1993)) (emphases in original). Bartlett argues that the decision in *Seo* compels a holding that it owed no duty beyond its express, limited contractual obligation to remove the visible large *Araucaria* cones. Reviewing *Seo* will both lay out the most relevant aspects of California negligence law, and permit the court to assess the parties' arguments.

In *Seo*, a subtenant of commercial premises was injured when he reached through the property's sliding entry gate; with his arm extended through the bars of the gate, he threw the gate's power toggle, the gate began to move, and it crushed his arm. *Seo*, 97 Cal. App. 4th at 1197–98. He then brought a negligence suit against the company that had made "occasional as-needed repairs" to the gate. *Id.* at 1197. The *Seo* plaintiff's duty arguments parallel Mr. Mace's. Much like Mr. Mace here, the *Seo* plaintiff argued that the gate-repair company had duties that went beyond the agreed-upon repairs. He located these extended duties both in the frequent (if *ad hoc*) repair contracts, and in the very fact that the company had worked on the gate — in other words, "by virtue of [the] defendant's status as an independent contractor called upon to make repairs to the gate." *Id.* at 1204–05. The *Seo* plaintiff contended that the repair company had thus "undertaken a duty to inspect and repair the gate on a regular basis," and so owed a duty to "warn of or correct" alleged defects in the gate. *Id.* at 1199–1200.

The trial and appellate courts rejected these duties and awarded the repair company summary judgment. *Id.* at 1197–98, 1203–07. Moving more deeply into California negligence law, the appeals court explained: "In considering whether a party has a legal duty in a particular factual situation, a distinction is drawn between claims of liability based upon misfeasance and those based upon nonfeasance." *Id.* at 1202. "Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk." *Id.* (quoting *Jackson*, 16 Cal. App. 4th at 1838). "Liability for misfeasance is based on the general duty of ordinary care to

prevent others from being injured by one's conduct." *Id.* (citing Cal. Civ. Code, § 1714(a) and *Weirum v. RKO Gen., Inc.* 15 Cal.3d 40, 49 (1975)). "Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention . . . ." *Id.* (quoting *Jackson*, 16 Cal. App. 4th at 1838). "Liability for nonfeasance is limited to situations in which there is a special relationship that creates a duty to act." *Id.* (citing *Eric J. v. Betty M.*, 76 Cal. App. 4th 715, 717 (1999)). Put slightly differently: "A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." *Id.* at 1203 (quoting *Eric J.*, 76 Cal. App. 4th at 727). Certain, familiar "special relationships" are recognized in California negligence law, such as those between common carriers and passengers, psychotherapists and patients, school districts and students, and the like. *See id.* "A special relationship may also arise out of a . . . contractual duty." *Id.* Of particular relevance here:

> A special relationship may arise out of a contract in which a repair company agrees for a fee to keep a piece of equipment in repair, perform all work necessary for the safety and maintenance of the equipment, and make periodic inspections of the equipment.

*Id.* at 1204 (citing *Jackson*, 16 Cal. App. 4th at 1838 and *Dahms v. Gen. Elevator Co.*, 214 Cal. 733, 734, 737 (1932)).

The appellate court held that the repair company owed the *Seo* plaintiff no duty that would undergird a negligence claim. The claimed failures to inspect and maintain the gate on a regular basis, and to warn of or correct defects, "constitute[d] classic nonfeasance." *See id.* at 1203. Those duties could thus arise only from a special relationship. *Id.* at 1204. No traditional "special relationship" existed between the gate-repair company and the property owner or the plaintiff. *See id.* at 1197–99, 1203. And — in the pivotal part of its decision — the *Seo* court held that no such relationship lay in either the occasional repair contracts or the repair work itself.

As for a contractual duty, the *Seo* court reasoned that the company had been "called to work" on the gate "on an as-needed basis." *Id.* at 1204. The repair company "did not have a regular contract to service the gate." *Id.* at 1199. It was "undisputed" that the company "had entered into no . . . written contract" with the property owner "to keep a piece of equipment in repair, perform

all work necessary" on the gate, or to "make periodic inspections of the equipment." *Id.* at 1204. Nor had the repair company "agreed to warn the owner of the property of any design defects of the gate or install safety features that might have prevented plaintiff's accident." *Id.* Though repair calls had at times been frequent, even monthly in one year, "each of the calls was to make specific repairs." *Id.* at 1203. "None of th[e]se . . . repairs caused plaintiff's injuries." *Id.* The defendant in fact did no work on any part of the gate that was allegedly involved in the plaintiff's accident. *See id.* at 1199, 1204. The appellate court concluded: "Neither the frequency of the repair calls nor the inspection of the potentiometer" — this being a component that the company checked regularly, for safety reasons, before working on the gate; the plaintiff did not argue that this component was involved in his injury, *id.* at 1199 and n. 2 — "gives rise to an inference of an implied contract between the owner of the property and defendant to regularly inspect and maintain the gate." *Id.* at 1204. Which is all to say, in sum, that the *ad hoc* repair calls did not yield an extended duty to regularly inspect, maintain, and give warnings about potential problems with the gate. *See id.* at 1203–04.

The court then rejected the argument that a "duty to warn" the property owner of a "design defect of the gate" could arise directly "by virtue of [the] defendant's status as an independent contractor called upon to make repairs to the gate." *Id.* at 1205–06. The *Seo* plaintiff had argued that "an independent contractor repairer has a duty to third parties to warn the owner of design defects of the equipment repaired, unrelated to the repairs made." *Id.* at 1205. The California Court of Appeal rebuffed this suggestion:

> Since this case involves only nonfeasance and defendant and plaintiff fall into none of the recognized "special relationships," plaintiff essentially requests that we adopt a new category of special relationship creating a duty of repairers to third parties. This we decline to do. Any duty of the repairer arises out of its contract with the owner to repair the equipment for a specified fee and no justification exists to extend that contractual duty beyond the intent of the contracting parties. That the repairer has superior knowledge and may recognize the design defect is not sufficient in and of itself to create a duty to third parties.

*Id.* The *Seo* court found its conclusion "buttressed by the fact that every other jurisdiction that has considered the question has found no special relationship and no [extended] duty" in such circumstances. *Id.* at 1206 (citing, *inter alia*, *Sculles v. Am. Envtl. Prods., Inc.* N.E.2d 271, 273 (Ill.

App. 1992) (as-needed repair service company had no duty to warn of potential hazards of commercial baler when it had not contracted to look for safety hazards), and *Risk v. Woeste Eastside Motors, Inc.* 696 N.E.2d 283 (Ohio App. 1997) (mechanic's scheduled 90,000-mile service of a car does not include the duty to inform driver of other recommended services)).[43] The *Seo* court underlined its decision by reasoning that "a new category of special relationship for repairers and third parties" would have unwanted public-policy effects. *Id.* at 1205–06.

The *Seo* court summarized its decision:

> The independent contractor repairer owes no duty to a third party injured by equipment repaired . . . where the injury does not arise out of the repair and is unrelated to the repair. Such a repairer owes no duty to a third party to inspect the equipment and advise the owner of any design defects . . . . Here, the repairer owed no duty to the injured third party.

*Id.* at 1206.

### 2.2 Analysis

We can now assess *Seo's* impact on this case. Bartlett argues that under *Seo* it owed no extended duties — such as developing a maintenance plan for the *Araucaria* trees, or advising the NPS on how to make the tree stand safer — that went beyond its limited contractual commitment to remove the visible large cones. The plaintiff disagrees. It finds *Seo* distinguishable and contends that extracontractual duties sprang from the industry standards that Bartlett itself touted as governing its work. It also points to an NPS employee's testimony that, in preliminary discussions with Bartlett over the work that would be done on the *Araucaria* trees, the NPS relied on Bartlett to provide recommendations that were appropriate to dealing with the trees.

The court agrees with Bartlett. There is no doubt that *Seo* shares much in common with this case. The defendant repairer in *Seo*, and Bartlett here, are in similar positions. Still, the decision in *Seo* differs from this case in significant ways. These differences prevent the court from dismissing Bartlett at this juncture.

---

[43] The last two parenthetical explanations are taken verbatim from *Seo*, 97 Cal .App. 4th at 1206.

United States District Court
Northern District of California

First, the injury in *Seo* was "unrelated" to the repair company's work and to the extended duties that were alleged to grow from that work. *See Seo*, 97 Cal. App. 4th at 1197–98, 1202, 1205–06. That is not true here. Mr. Mace's injury is tightly bound to the removal of the cones; the extended duties that Mr. Mace would impose on Bartlett (in sum, to advise the NPS on how to deal with the falling *Araucaria* cones) are also closely related to the removal work that Bartlett contracted to do.[44]

Second, *Seo* did not address the effect of industry standards. Here, Bartlett's own contract language stated that the company's work would be "done in accordance with ANSI A300 Tree Care Standards."[45] The parties disagree over the extent to which those standards cover the pruning that Bartlett contracted to do. They disagree over whether an extended duty could have grown from the particular standards that may apply. But the parties have not sufficiently elaborated this part of the analysis. And the court's own, closer review of the record does not permit it to summarily say whether the ANSI standards did or did not create a relevant duty (one that expanded Bartlett's contractual obligations in a pertinent way). The plaintiff has done enough to raise the issue for trial.

Finally, as Mr. Mace points out, NPS employee Micah Wright agreed that, in hiring Bartlett, the agency relied on the arborist to "take an overall look" at the *Araucaria* trees and "take care of it."[46] Specifically, Mr. Wright testified:

> Q: On those occasions when you're involved in contacting Bartlett . . . to come in and do an evaluation of the *Araucaria* trees, you're relying on Bartlett's expertise?
>
> A: Correct.
>
> Q: Expectation that they're going to identify all areas of maintenance that are necessary?
>
> A: Yes. . . . I'm going to ask them to — to take a look at what we feel — we have a hunch that could be hazardous. And then we're going to ask them to take an

---

[44] Tying the alleged extended duties to the work that Bartlett did should dilute the negative policy effects that *Seo* worried about. *See Seo*, 97 Cal. App. 4th at 1205–06. Any expanded duties will be bound in the usual net of foreseeability.

[45] *E.g.*, ECF No. 57-2 at 81.

[46] Wright Dep. – ECF No. 68 at 23 (p. 80).

United States District Court
Northern District of California

overall look at the tree or trees in question and give us feedback and take care of it . . . .

Q:  Correct that you're relying on Bartlett's expertise to provide a full evaluation of all potential safety hazards?

[Defense counsel]:      Objection. Vague. Ambiguous. Overbroad.

A:  Yes.[47]

This evidence may not be as strong as the plaintiff suggests. Mr. Wright's agreement was elicited by leading questions — and it is mostly those questions, rather than Mr. Wright's answers, that carry the operative information ("make all necessary recommendations"; "evaluat[e] . . . all potential safety hazards"). But, along with the other considerations just discussed, the court thinks that this is all enough to distinguish this case from *Seo* and to save Mr. Mace's "extended duties" theory of recovery from summary judgment.

### 2.3 Holdings

The court reaches the following specific holdings on the negligence claim against Bartlett.

The court grants summary judgment in Bartlett's favor against the plaintiff's claim that Bartlett was negligent in failing to remove "all" the *Araucaria* seed pods that "posed a risk of harm to members of the general public."[48] It is undisputed that Bartlett did not contract to remove "all" the potentially hazardous cones. The contract between Bartlett and the NPS specifically obligated Bartlett to remove only the "visible large cones." (ECF No. 57-2 at 48.) With respect to pruning, Bartlett had no duty to do more. That said, the court cannot conclude as a matter of law that Bartlett removed all "visible large cones." That is a fact issue that survives summary judgment.

The court also denies Bartlett summary judgment against the plaintiff's claim, or suggestion, that Bartlett failed to remove the specific cone that, 19 months later, struck Mr. Mace. Again, it is a disputed fact whether, when Bartlett did its work, that particular cone was "large" and "visible." Put another way, the court cannot conclude as a matter of law that the cone did not exist in visible form when Bartlett pruned the trees in February 2013. The court appreciates that neither the

---

[47] *Id.*

[48] 1st Am. Compl. – ECF No. 33 at 11 (¶ 54).

1    United States' expert witness, nor Mr. Mace's, could say that the accident cone was on the tree in

2    February 2013.[49] But there are reasonable inferences from the record about the trees and their

3    growth, and there is percipient witness testimony that needs to be heard to be credited on this

4    point.

5         The plaintiff also has raised a triable issue on its following "nonfeasance" theories under the

6    extended-duties analysis above. There is a genuine issue that Bartlett had a duty but failed to: (1)

7    warn the NPS that removing only some of the cones (partial pruning) could cause the trees to

8    produce new cones more quickly and could cause remaining cones to mature faster[50]; (2)

9    recommend prospective safety-pruning measures; and (3) advise the NPS about ways in which to

10   make the *Araucaria* stand safer for park users — such as installing warning signs or planting a

11   "soft" landscape barrier near the base of the trees.

12                                        *   *   *

---

[49] *See* Leggitt Dep. – ECF No. 65-1 at 5–7; Clark Dep. – ECF No. 65-1 at 10–12.

[50] The partial pruning cannot itself be negligent misfeasance. This would directly contravene the contract term that expressly describes the scope of Bartlett's pruning work: i.e., that the arborist agreed only to prune branches and remove "visible large cones." Whether Bartlett had a duty to advise the NPS of the alleged effects of partial pruning is a different question.

**CONCLUSION**

The court denies the United States' motion under California Civil Code § 846. The court grants Bartlett's motion against the plaintiff's claim that Bartlett wrongfully failed to remove "all" the *Araucaria* seed pods. Bartlett's contract obliged it to remove only the "visible large cones." It is a disputed fact whether it does so; the negligence claim thus survives summary judgment. The plaintiff also has raised a triable issue on its following extended-duty "nonfeasance" theories. There is a genuine issue that Bartlett had a duty but failed to: (1) warn the NPS that removing only some of the cones (partial pruning) could prompt the seed pods to mature faster; (2) recommend prospective safety-pruning measures; and (3) advise the NPS about ways in which to make the *Araucaria* stand safer for park users. In those respects Bartlett's motion is denied.

This disposes of ECF Nos. 57 and 58.

**IT IS SO ORDERED.**

Dated: March 23, 2017

LAUREL BEELER
United States Magistrate Judge